UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | NO. 5:19-CR-35-DCR-MAS |
| v. ) | |
| ) | |
| JAMEEL SLEET, ) | |
| ) | |
| Defendant. ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

### REPORT AND RECOMMENDATION

This case is before the Court on Defendant's Motion to Suppress. [DE 24]. The district judge referred this matter to the undersigned for a Report and Recommendation. The United States responded to the Motion [DE 27], Defendant replied [DE 29], and the Court held a hearing at which the parties presented witnesses and arguments to the Court. [DE 33]. For the reasons stated herein, the Court recommends the District Court deny Defendant's Motion to Suppress.

**I.   FACTUAL BACKGROUND**

On November 14, 2018, Detective Jody Kizis ("Kizis") with the Lexington Police Department gang unit was conducting surveillance of Tavis Chenault ("Chenault"). Kizis observed Chenault and three other individuals exit a vehicle, enter a residence, and then return to the vehicle with Chenault behind driving the vehicle. Kizis alerted patrolling officers Brandon Hazlewood ("Hazlewood") and Detective Luke Valdez ("Valdez") that the vehicle Chenault was driving was heading towards North Broadway. Earlier that day, Kizis had briefed Hazlewood and

Valdez on his investigation of Chenault: Chenault was a validated member of the Kill or Be Killed gang; he stated on social media that he carried firearms; Chenault associated with gang members; Chenault was suspected of drug trafficking; other individuals in the vehicle could be gang members or associates and could be armed and dangerous; during Chenault's last interaction with law enforcement, he was with another known gang member and in possession of a stolen firearm and body armor. [DE 33, Recording at 9:13-12:25].

Based upon the information from Kizis, Hazlewood trailed the vehicle and observed the license plate lamp was not illuminated.[1] Hazlewood stopped the vehicle and Valdez arrived on the scene almost immediately. Hazlewood approached the passenger side of the vehicle while Valdez approached the driver's side of the vehicle. Both officers testified that they observed the plain smell of marijuana upon talking with the occupants of the car through the open windows.[2] Consequently, the officers to order the occupants out of the vehicle so they could search the vehicle. In addition to Chenault and Sleet, Angela Renfro (Chenault's mother) and Devin Lovette (an individual known to Valdez to be a gang member) exited the vehicle. When Sleet exited the vehicle, Valdez conducted a patdown. Valdez felt something in Sleet's pocket, which he testified he immediately recognized as a plastic bag likely containing narcotics. Valdez ordered Sleet to remove the bag from his pocket and confirmed that it appeared to be a bag of narcotics. He placed Sleet under arrest. At police headquarters, more illegal drugs were found on Sleet's person.

Sleet argues that the stop and frisk violated his Fourth Amendment rights on an number of grounds: (1) there was no valid reason for the traffic stop; (2) Valdez did not have reasonable

---

[1] Kizis had directed Hazlewood to stop the vehicle because Chenault did not have a valid driver's license. However, Hazlewood, in his report and during his testimony, stated that he elected to stop Chenault due to the lack of illuminated license plate.

[2] No marijuana or marijuana paraphernalia was found in the vehicle or on the persons occupying the vehicle.

2

suspicion that he was armed and dangerous to justify a patdown; (3) Valdez exceeded the scope of a Terry patdown; and (4) Sleet did not voluntarily remove the narcotics from his person.

## II.   ANALYSIS

### A.   VALIDITY OF THE *TERRY* STOP

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)).  In determining whether a stop exceeded the proper bounds of *Terry*, "the totality of the circumstances—the whole picture—must be taken into account.  Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

The constitutional reasonableness of a traffic stop, however, does not depend "on the actual motivations of the individual officers involved. [. . .] Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996). Hazlewood had probable cause to stop Chenault for the plate lamp violation, regardless of his actual intention to investigate the vehicle for drugs and narcotics.  Sleet argued that it was at least questionable whether the plate lamp was illuminated based on the car owner's insistence at the scene that it was illuminated.  Hazlewood, however, provided sworn testimony that it was not illuminated.  Albeit hard to see, Hazlewood's testimony appears supported by the body cam footage. [DE 33, Recording at 00:34:33-50; DE 30, USA-207 at 00:37-8; USA-217 at 00:27-36]. Moreover, Hazlewood also had knowledge from Kizis that Chenault did not have a valid driver's license. This information would have also provided a valid reason for the traffic stop, even though

he did not mention it when he stopped the vehicle for fear of tipping Chenault off to the on-going investigation of him. [DE 33, Recording at 56:10-33].

Hazlewood approached the passenger side of the vehicle to discuss the plate lamp violation and observed the plain smell of marijuana. Approximately at the same time, Valdez approached the driver's side of the vehicle and observed the plain smell of marijuana. Once the officers observed the odor of marijuana, they had probable cause to extend the traffic stop to search the vehicle for drugs. It is well-settled law that "an officer's detection of the smell of marijuana in an automobile can by itself establish probable cause for a search." *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002). *See also United States v. Johnson*, 707 F.3d 655, 658 (6th Cir. 2013); *United States v. Lueck*, 678 F.2d 895, 903 (11th Cir. 1982) ("At the point marijuana was smelled by Officer Helgeson, probable cause to believe a crime had been committed, namely the importation and possession of contraband, arose.").

For these reasons, the Court recommends the District Court find that the stop, though pretextual, was a valid *Terry* stop, and the continuation of the stop was supported by probable cause upon two officers' detection of the plain smell of marijuana.

**B.   REASONABLE SUSPICION AND THE SCOPE OF THE FRISK**

Once the officers had probable cause to search the vehicle, it was necessary to ask the occupants to exit the vehicle to conduct the search. The Court finds that Valdez had reasonable suspicion that Sleet was armed and dangerous such to justify a patdown for weapons.

Valdez outlined his prior experience with Sleet in support of his reasonable suspicion that Sleet was armed and dangerous. In March 2018, Valdez was involved in the execution of a search warrant at a residence on Hinton Road. Sleet, along with verified gang members and gang associates including Tavis Chenault, were at the residence at the time the search warrant was executed. The officers there found seven new iPhones destroyed, two stolen firearms, heroin, and

counterfeit money. The circumstances of the gathering and the contraband found at the residence led Valdez to believe this was a gang meeting, and the individuals present might be engaged in drug trafficking and gang violence. [DE 33, Recording at 1:00:20-1:04:50]. Although Sleet was not arrested at the time that the search warrant was executed, Valdez concluded Sleet might be involved with a gang because of his association with known gang members and associates. Valdez could not attribute the stolen firearms to Sleet, but he also could not rule out Sleet as the owner of the firearms. [*Id*. at 1:18:00-18]. Valdez testified that in his experience, younger gang members are more likely to carry firearms and act recklessly. [*Id*. at 1:09:00-1:12:32].

The Supreme Court's decision in *Arizona v. Johnson*, 555 U.S. 323 (2009) is directly on point as to the scope of the frisk and whether it was reasonable at its inception. In *Johnson*, police officers in the gang task force were patrolling a neighborhood associated with gang activity. The officers stopped a vehicle for a traffic violation. The officers had no reason to believe any of the four occupants of the vehicle were involved in criminal activity. One of the backseat passengers, Johnson, drew the attention of one of the officers because he had a blue bandana (consistent with Crips gang association) and a police scanner. *Arizona v. Johnson*, 555 U.S. 323, 328 (2009). During the encounter, Johnson volunteered that he was from Eloy, Arizona, a city the officer knew had Crips gang activity, and that he had previously served time in prison. *Id*. Based only on that interaction, the officer asked Johnson to step out of the car and frisked him "for safety." *Id*. The Supreme Court held the frisk did not violate Johnson's Fourth Amendment rights. The Court noted that "the risk of a violent encounter in a traffic-stop setting stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop[,]" and that "as a practical matter, the passengers are already stopped by virtue of the stop of the vehicle, so the additional intrusion on the passenger

5

is minimal[.]" *Arizona v. Johnson*, U.S. 323, 331–32 (2009).  The fact in *Johnson* are very similar to those at issue in this case, and support the conclusion that undertaking the frisk was reasonable.

"[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 22 (1968).  Here, Valdez articulated the following specific facts which led him to believe Sleet might be armed and dangerous: (1) he recognized Sleet from the Hinton Road incident where there was suspected gang activity, large quantities of heroin, and stolen firearms present; (2) Valdez was not able to rule out Sleet as the owner of the stolen firearms recovered at Hinton Road; (3) Sleet was, for the second time, in the presence of Chenault and Lovette, known members or associates of the Kill or Be Killed gang; (4) in his professional experience, younger members or associates of gangs, such as Sleet, typically possess weapons while the older and more seasoned members or associates, such as Lovette, do not; (5) Chenault began to cause a commotion with Hazlewood, which is a tactic Valdez recognized as one sometimes used by those involved in criminal activity to allow another person an opportunity to conceal or dispose of contraband; (6) Chenault is known by Kizis to carry firearms on his person, and this fact had been communicated to Valdez; (7) Valdez had come into contact with Lovette at Hinton Road and in another, separate incident where he did not possess a firearm but someone else accompanying him did; and (8) Sleet put his hands in his pockets upon exiting the vehicle.  [DE 33, Recording at 58:56-1:27:52].

"[T]he concept of reasonable suspicion ... is not readily, or even usefully, reduced to a neat set of legal rules, but must be determined by looking to the totality of the circumstances—the whole picture[.]" *Illinois v. Wardlow*, 528 U.S. 119, 126–27 (2000) (internal quotations and citation marks omitted)(ellipsis in original).  "Even if each specific fact relied upon by the

6

authorities to make a *Terry* stop would not be a basis for suspicion when considered in isolation, the reasonable suspicion necessary to support an investigatory stop can still be found when it is based upon an assessment of all circumstances surrounding the actions of a suspected wrongdoer [,] including those facts that would arouse suspicion only in someone experienced in law enforcement matters." *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993) (internal quotations and citation marks omitted). The totality of the circumstances during this traffic stop, as outlined in Valdez's testimony, was sufficient to give rise to the reasonable suspicion that Sleet could have been armed and dangerous. [DE 33, Recording at 1:27:53-1:28:53].

Regarding the scope of the frisk, Valdez testified that he recognized the feel of narcotics on his first pass of Sleet's pants pocket. See *infra* at C. When Valdez identified what he believed to be narcotics in one of Sleet's pockets, he had not completed his patdown for weapons. In the pursuit of safety, it was reasonable for Valdez to complete the patdown for weapons and then turn to the issue of the suspected narcotics in Sleet's pocket. It is immaterial whether he felt the narcotics again on a subsequent pass by Sleet's pocket. [DE 33, Recording at 1:32:50-1:34:33].

The Court recommends the District Court deny the motion to suppress on these grounds.

C. **THE PLAIN FEEL DOCTRINE AND VOLUNTARY REMOVAL OF CONTRABAND FROM POCKET**

According to the police report and as emphasized by Sleet, the search of Sleet was described as consensual. [DE 24, p. 8-9 and DE 24, Ex. 1]. The body cam footage, however, plainly proves otherwise as acknowledged by Valdez. Rather, the United States relies upon the plain feel doctrine to justify the removal of the contraband from Sleet's pockets. The Court would agree.

The United States Supreme Court upheld the so-called "plain feel" doctrine in *Minnesota v. Dickerson*, 508 U.S. 366 (1993). In that case, the defendant's evasive actions arose the

7

suspicions of law enforcement, who stopped him and conducted a patdown for weapons. The officer felt a "lump" in the defendant's pocket, consistent with what he believed to be a rock of crack cocaine. He reached into the defendant's pocket and retrieved the item, which was the suspected crack cocaine. The Court held that the plain feel of contraband is analogous to the plain view of contraband, for which obtaining a seizure warrant would "often be impracticable and would do little to promote the objectives of the Fourth Amendment." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Accordingly, "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context." *Id*. at 375–76.

The Court sees no distinction between the facts in *Dickerson* and the search and seizure at issue in this matter. Valdez testified that on his first pass of Sleet's pant pocket, he felt an item that he immediately recognized as something consistent with powder narcotics in a plastic bag. [DE 33, Recording at 1:28:43-1:29:06]. When cajoled by Valdez to produce the object in his pocket, Sleet produced a bag of narcotics. The issue of consent is immaterial because once Valdez plainly felt the object during the patdown that he believed to be consistent with a bag of narcotics, Valdez could have lawfully reached into Sleet's pocket to remove it pursuant to *Dickerson*. *See also United States v. Walker*, 181 F.3d 774 (6th Cir. 1999) (upholding the "plain feel" doctrine).

Accordingly, the Court recommends the District Court find that the seizure of the baggie of narcotics from Sleet's pocket did not violate his Fourth Amendment rights.

### III.    CONCLUSION

For reasons stated herein, the Court **RECOMMENDS** that the District Court **DENY** the Motion to Suppress [DE 24]. The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal

8

rights concerning this recommendation, issued under subsection (B) of said statute. As defined by § 636(b) (1), Fed. R. Crim. P. 59(b), and local rule, within **fourteen** days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, de novo, by the District Court.

Entered this 25th day of March, 2019.



Signed By:
Matthew A. Stinnett
United States Magistrate Judge